530 So.2d 1001 (1988)
JACKSONVILLE RACING ASSOCIATION, INC., and Julian Klein, Appellants,
v.
Dwight Alan HARRISON, Appellee.
No. 87-963.
District Court of Appeal of Florida, First District.
August 24, 1988.
*1002 Ronald R. Oberdier, of Humphries, Kellogg & Oberdier, Jacksonville, for appellants.
Warren K. Anderson, Jr., and Jeffrey J. Sneed, of Anderson & Howell, Jacksonville, for appellee.
WENTWORTH, Judge.
This is an appeal of a final judgment imposing liability on appellants Jacksonville Racing Association, Inc. (JRA) for $152,710 and Julian Klein (Klein) for $157,830 pursuant to jury verdict for personal injuries suffered by appellee Dwight Alan Harrison.
Appellants contend the trial court erred in 1) denying JRA's and Klein's motions for directed verdict and motion for judgment in accordance with motion for directed verdict; and 2) denying JRA's and Klein's alternative motion for new trial, based on alleged error in failing to discharge the alternate juror prior to the jury beginning deliberations; in allowing testimony objected to by the defendants to be considered by the jury; in charging the jury; and in sustaining a verdict which was alleged to be against the manifest weight of the evidence and the product of confusion. We affirm.
The record evidence is that on September 1, 1986, Labor Day, appellee went to an automobile racetrack in Jacksonville to film a friend in a race. JRA owned the track and Klein leased it on Saturdays and occasional holidays to promote races. Klein also originally built it. Other than Saturdays, JRA had control of the facility. Klein employed security, including off-duty police officers and gate attendants, but JRA also had authority to regulate security. Since it owned the track, it had authority *1003 over the physical layout as well. Ray Stamps (Stamps) was a wrecker driver who provided free wrecker services to keep the track clear during races. Stamps, a racer, was not actually supervised by Klein but was subject to his ultimate control. Stamps got free advertising and personal enjoyment for his services. Klein testified that he usually did not have to hire a wrecker because there were plenty of volunteers, but he had paid in the past and a race cannot be run without such service.
A part of the infield called the pit, where cars were serviced during the race, was separated from the rest of the infield by a small building and a fence. A gate next to the building allowed access from the infield to the pit. Evidence indicated access to the pit was intended to be restricted to those who purchased a pit pass and signed a release. A gate attendant, directly employed by Klein, was responsible for enforcement. There were also signs at the exit from the grandstands forbidding underage children, alcohol, and entrance without a pit pass. The only sign at the pit gate, however, forbade alcohol. The pit was a large, unpaved, dirt area with oil slicks, puddles, and tire ruts throughout. A portion closest to the track was used as the "pit road," but there were no markings showing its boundaries.
Appellee testified that he and a woman walked past the gate attendant, carrying a camera, without being stopped or questioned. Once inside, appellee began filming. At some point, Stamps began backing his wrecker and hit appellee. Appellee was thrown over the back of the wrecker and suffered a fractured sacrum. He was hospitalized and bedridden for several months. Ultimately, he returned to work as a pressman. Appellee, 31, had held that job for ten years. He and his supervisors testified that he was unable to perform heavy work after his return to the job. Although he could do easier assignments, he could not be permanently assigned to them because rotating all workers in all positions was necessary. After a few months, appellee resigned. The record indicates that he quit because of disputes with management as well as inability to do the work, but the disputes were largely related to his inability to do heavy work. Appellee testified he did not know the pit was off limits, saw no signs, and received no warnings. He had been to the track once a few years earlier.
According to appellants' witnesses, security was always tightly enforced at the pit. An off-duty policeman employed as a security guard, who was also a part-time racer, testified he had warned appellee that he needed a "spotter" if he was going to film so that nothing would hit him from behind. Appellee denied this and in corroboration presented testimony of a private investigator who went to the track six weeks after the accident and talked with the officer. The investigator questioned the officer extensively, but was never told that appellant had been warned. In response to testimony by appellants that security remained as tight after the accident as it had been before and that no one was allowed in without a pass, appellee submitted testimony from the same investigator that he had gone to the track with his 13-year old son six weeks after the accident and had walked into the pit without being checked. No attendant was present at the gate.
Appellee presented expert testimony from Dr. Trayham, an assistant dean and economics professor at the University of North Florida, and Ed Rasco, a vocational rehabilitation specialist. Rasco testified that he had reviewed appellee's doctor's depositions and had personally tested appellee. Appellee performed poorly, in part because of limited intellectual capacity. According to Rasco, appellee must change his physical position frequently and probably will not find an employer who will hire him. If he does, his lack of skill makes him eligible for minimum wage work only. Put simply, appellee's prior job provided a "niche" where he could earn over $10 hourly. He cannot do that now and will therefore not be able to earn his preinjury income. Prior to his accident he was a good worker, winning frequent raises and commendations. Dr. Trayham testified to the present value of appellee's lost future earnings, calculating that appellee had already *1004 lost $12,000 and that the present value of future lost earnings and fringe benefits was $514,000. No objection was made to the qualifications of either expert.
After the judge charged the jury, he asked the members of the jury to retire, select a foreperson, and decide whether they wanted to deliberate that night or begin deliberations the next day. The jury retired. The court had not discharged the alternate juror, who was consequently present when the jury elected the foreperson and decided to inform the court that they would begin deliberations that night. However, the record does not indicate whether the alternate actually participated because there was no objection when the alternate's presence was discovered, and no inquiry was made. After the jury returned to the courtroom the judge told the jury to retire and begin deliberations, but the foreperson told the judge the jurors needed to make phone calls first. The judge assented but asked the jury to leave for "just a minute" because counsel wanted to present an unrelated point. After a minute or two the judge brought the jurors back to make their calls, and then excused the alternate. The verdict was rendered the following day after some seven hours' deliberation. The attorneys did not at any time object to the alternate's presence, and their posttrial Motion for Judgment in Accordance with Motion for Directed Verdict states only that the jurors were improperly influenced by outside sources or matters "dehors the record."
The jury found JRA 33% responsible, Klein 34% responsible, and appellee 33% responsible. It fixed damages at $512,000. The final judgment ordered Klein to pay $157,830 and JRA to pay $152,710, less a $32,500 setoff from appellee's settlement with Ray Stamps.
The trial court submitted the case to the jury on two theories of liability for a determination of: 1) whether appellants were responsible for the driver's negligence because he was their agent, and 2) whether appellants were both affirmatively negligent for failing to supervise their employees or otherwise make the track reasonably safe. We affirm with respect to issue (2), because the complaint alleged and the evidence showed that JRA and Klein were themselves negligent because of their own acts or acts of employees whom they directly supervised. There was substantial evidence that the pit was dangerous, improperly supervised, and that Klein and his employees breached their duties to warn or otherwise supervise to alleviate the danger. Regarding JRA, the evidence is also sufficient to impose liability because of the numerous admissions by JRA's owners. They owned and controlled the track six days a week during the period of the accident, and their employees controlled and operated the concession stand located in the building next to the pit gate. They admitted being responsible for security at the race, including authority over the gate keeper and the off-duty police hired as supervisory personnel inside the pit. They also admitted control over the condition of the premises, which would include the unmarked road and the lack of signs. These admissions of control distinguish this case from Gerlach v. Trepanier, 440 So.2d 73 (Fla. 5th DCA 1983), and other such cases where landowners had completely relinquished control to a lessee.
As to the contention that a new trial is required because of the alternate juror's presence, the question here is whether the alternate was present during jury deliberations. Many of appellants' cited decisions in support of reversal involve situations where the alternate was present during the course of deliberations. Eickmeyer v. Dunkin Donuts of America, 507 So.2d 1193 (Fla. 3d DCA 1987); Lamadrid v. State, 437 So.2d 208 (Fla. 3d DCA 1983); Berry v. State, 298 So.2d 491 (Fla. 4th DCA 1974). Here, there appears to be no reasonable possibility that the alternate participated in any substantive deliberations, but was present during the foreperson's election and the decision on whether to begin deliberations.
Although no Florida case involves identical facts, Fischer v. State, 429 So.2d 1309 (Fla. 1st DCA 1983), is certainly consistent with an emphasis on defining when deliberations begin and applying harmless error doctrines to alternate juror presence prior to that point. In both Fischer and Berry, supra, the alternate juror sat through all *1005 deliberations, in contrast with the circumstances here. And in this case the error was never brought to the court's attention as a basis for mistrial or other relief, but is instead first articulated by briefs in this court. Although U.S. v. Beasley, 464 F.2d 468 (10th Cir.1972), holding twenty minutes' presence of an alternate to be fatal, was cited favorably by the opinion in Fischer, we note that our decision there related to alternate presence throughout deliberations. The court in Fischer was therefore not concerned with distinctions between jury deliberation and those activities merely preparatory thereto. The quotation of language from Beasley, to support its rejection of a prejudice standard, does not indicate approval of Beasley's sweeping inclusion of non-deliberative activities in those which would be fatally tainted by alternate juror presence. The Fischer decision accordingly does not preclude application of harmless error principles here.
Appellee cites Sloan v. State, 438 So.2d 888 (Fla. 2d DCA 1983), as permitting an affirmance in this case. There, an alternate juror sat in on part of the jury's deliberations before she was discovered. The court then conducted an inquiry and asked defense counsel if he wanted a mistrial. Counsel specifically waived objection, and defendant was convicted. On appeal, the court wrote that because the defendant "affirmatively elected not to move for a mistrial," the conviction would be affirmed. Responding to the suggestion that the error was fundamental and could not be waived, the court held:
A defendant is only constitutionally guaranteed a trial by a jury of six persons... . Florida Rule of Criminal Procedure 3.250 even permits a defendant . .. to waive a jury in its entirety. The appellant is bound by his waiver.
The circumstances detailed above in the present case, although not reflecting explicit waiver, do demonstrate the parties' knowledge of the jury's actions and failure to voice objection. We conclude that the record here warrants a distinction between the alternate juror's presence for the limited organizational activity here in question, and those cases above cited in which actual deliberation was commenced. This resolution is supported by decisions in other states. Logue v. State, 308 S.E.2d 189 (Ga. 1983); State v. Bonneau, 276 S.E.2d 300 (S.C. 1981); State v. Epps, 313 N.W.2d 553 (Iowa 1981); State v. Rocco, 119 Ariz. 27, 579 P.2d 65 (Ct.App. 1978).
We find no error insofar as new trial was claimed on the basis of error in admitting certain testimony. The testimony as to children being unsupervised in the pit was admitted several times from various witnesses before the first objection was made. As for testimony by the investigator, the only objection made was for insufficient predicate. The trial court correctly ruled that a predicate had been laid for such rebuttal testimony when appellants testified that the security situation was always tight and had remained the same after the accident. As to jury instructions, we find no error in refusal of instruction on appellee's status on the property based on the instruction's legal irrelevance under the second liability theory, supra. Although such might have been relevant under an agency theory, any error is harmless. Under the "two-issue" rule, when no objection is made to use of a general verdict form reversal is improper "where no error is found as to one of the issues, as the appellant is unable to establish that he has been prejudiced." Colonial Stores, Inc. v. Scarbrough, 355 So.2d 1181 (Fla. 1977); Whitman v. Castlewood International Corp., 383 So.2d 618 (Fla. 1980).
As to the claimed instruction that appellee's failure to buy a pit pass prevented his receiving a warning, the record shows this argument was not made below during the charge conference. On alleged insufficiency of evidence no objection was raised below to either expert witness's qualifications. Their testimony satisfied the standard set out in Kelly v. Kinsey, 362 So.2d 402 (Fla. 1st DCA 1978).
AFFIRMED.
ERVIN and BOOTH, JJ., concur.